NOTICE

Decision filed 04/13/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 230430

NO. 5-23-0430

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Wayne County. |
| | ) | |
| v. | ) | No. 20-CF-162 |
| | ) | |
| BRODEY I. MURBARGER, | ) | Honorable |
| | ) | Michael J. Molt, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court, with opinion.
Justices Boie and McHaney[*] concurred in the judgment and opinion.

**OPINION**

¶ 1 A Wayne County jury found defendant, Brodey I. Murbarger, guilty of first degree murder. The trial court sentenced him to 50 years in prison with 3 years of mandatory supervised release. Defendant raises three arguments on appeal. First, defendant contends that the trial court's denial of a request for change of venue and request for appointment of an expert to conduct a phone survey deprived him of the right to a trial by an impartial jury. Next, defendant contends that he is entitled to a hearing pursuant to *People v. Harris*, 2018 IL 121932, to determine whether the sentencing protections established in *Miller v. Alabama*, 567 U.S. 460 (2012), apply to him. Finally, defendant contends that two of his murder convictions must be vacated under the one-act,

_____

[*]Justice Moore was originally assigned to the panel prior to his retirement. Justice McHaney was substituted on the panel and has read the briefs.

1

one-crime rule because there was only one decedent. For the reasons that follow, we affirm defendant's conviction. However, we vacate defendant's convictions and sentences on counts I and II and order the mittimus corrected accordingly.

¶ 2                                    I. BACKGROUND

¶ 3     We recite only those facts necessary to our disposition. The State charged defendant by information with the first degree murder of Megan Nichols. Count I alleged that defendant knowingly caused Nichols's death by suffocation. Count II alleged that defendant knowingly caused her death by strangulation. Count III alleged that he knowingly caused her death by means unknown.

¶ 4     At the time of the offense, defendant was 18 years old. Nichols went missing in July 2014 when she was 15 years old. Defendant and Nichols were in a dating relationship. Nichols remains were discovered in December 2017, and defendant was ultimately arrested in October 2020. Defendant was 26 years old at the time of his trial.

¶ 5     Prior to trial, defendant filed a "motion for change of place of trial." In his motion, he asked for a transfer of his trial to a different county. He argued that residents of Wayne County were prejudiced against him because of the extensive pretrial publicity his case received. Defendant argued that he experienced "harassment and scorn" and the pretrial publicity was of a nature and extent that "it would be impossible to find a jury from Wayne County that was free of prejudice" against him.

¶ 6     Defendant also filed a motion for the appointment of an expert to conduct a survey of the residents of Wayne County in support of his motion. Defendant noted that he was indigent and could not afford to hire an expert. The estimated cost of a survey was $8,000 to $12,000.

2

¶ 7       On March 18, 2022, the trial court held a hearing on defendant's motion to hire an expert to conduct a phone survey. Defense counsel argued that Wayne County was a rural county with few residents. Counsel argued that the residents of the county could not be fair and impartial due to "pretrial publicity, rumors, innuendo, and other prejudicial information that's been distributed throughout the community by the radio station, by the news media, by Dateline NBC, and by all kinds of various social media sources." Counsel argued that a survey would support defendant's motion for change of venue. Counsel noted that a survey would cost between $8,000 and $12,000. The State responded, arguing that defendant failed to make a showing of prejudice that the phone survey was necessary. The State acknowledged that defendant had a constitutional right to a fair and impartial trial; however, it argued that he did not have the constitutional right to conduct a phone survey. The State argued that the best way to pick the jury was through *voir dire*.

¶ 8       Following arguments from the parties, the court denied defendant's motion for an expert. The court reasoned that *voir dire* would obtain a fair jury in defendant's case. Specifically, the court noted that it reviewed the case law and the facts of the case. The court determined that *voir dire* was the best method to pick a jury. The court noted that if they were unable to pick a "fair and unbiased jury out of Wayne County," then "we're not going to have" a trial.

¶ 9       On July 12, 2022, the trial court held a hearing on defendant's motion for change of venue. Defense counsel first submitted Facebook comments related to the case. Defense counsel read negative comments from various social media and news posts aloud to the trial court. Defense counsel argued that, based on the comments, defendant could not receive a fair trial in Wayne County. Counsel argued that the case was "the talk of the town in Wayne County since 2014 when she disappeared and then again when her remains were discovered." The State responded, noting that not all residents of Wayne County use social media. The State also argued that "approximately

3

25 individuals" made "negative comments" on the posts submitted by defense counsel. Even so, the State noted that there was no indication that the 25 commenters were residents of Wayne County. The State further argued that any prejudice would be weeded out during the jury selection process. In rebuttal, defense counsel noted that signs to "pray" for Nichols were posted throughout the county.

¶ 10    Following arguments from counsel, the trial court initially noted that if the motion was denied, it would "allow it to be renewed during *voir dire* or in the event that I deny the Motion and we can't select an appropriate jury." Turning to the social media posts, the court observed that "some comments show a favorable position toward the Defendant." The court acknowledged that others were "unfavorable." Following its comments, the court took the matter under advisement. The court again stated, "I will emphasize that if I deny this Motion, it will be allowed to be renewed obviously if—during *voir dire* or if we're unable to pick a jury."

¶ 11    On August 15, 2022, in a written order, the trial court denied the motion for change of venue. The court determined that people commenting on social media may not be residents of Wayne County. The court noted that it reviewed social media comments submitted by defense counsel, and it observed that some comments were neutral as to defendant's guilt or innocence. The court determined that of the 36 comments listed in the exhibits, 9 of the comments were neutral as to defendant's guilt or innocence. The court noted that "11 of the comments were, in fact, either favorable to the Defendant, or indicated that the Defendant was entitled to due process and entitled to have all of his legal and constitutional rights protected during the trial." The court acknowledged that 16 comments indicated that the commenter "had a pre-conceived opinion as to the guilt of the Defendant which was not favorable to the Defendant."

4

¶ 12    The trial court noted that as of August 8, 2022, there were 10,750 registered voters in Wayne County. According to the court, "There were approximately 47% of the comments, from the Exhibits filed in this case, which were favorable, or at least which indicated the commenter was unbiased toward the Defendant." The court calculated: "If it is assumed that the commenters were a representative sample of the potential jurors in Wayne County, there would be 5,052 of the registered voters in Wayne County, Illinois, all of whom could be potential jurors, who would not be prejudiced or biased against the Defendant." The court also noted that, "*Voir dire* is the proper process to select a fair and impartial jury in this case, and it is the Court's opinion that the *voir dire* process should be undertaken before any decision is to be made to change the place of this trial." The court again stated that defendant was "entitled to renew his Motion for Change of Place of Trial in the event it is determined that it is not possible to select a fair and impartial jury during the *voir dire* process." Thus, the court denied defendant's motion for change of venue.

¶ 13    The matter proceeded to *voir dire*. Out of 45 potential jurors, 12 jurors and 2 alternates were selected. After the jury was selected, defendant renewed his motion for change of venue. Defense counsel argued that the majority of the *venire* were familiar with the case. The trial court denied the motion, noting that the 12 jurors and 2 alternates indicated that they could be fair and impartial, did not follow any publicity closely, and did not have preconceived opinions about the case.

¶ 14    Following the jury trial, after approximately one hour of deliberations, the jury found defendant guilty of all three counts of first degree murder. Relevant to this appeal, in a motion for a new trial, defendant argued that the trial court erred by denying his motion for the appointment of an expert and for a change of venue. The court denied the motion.

¶ 15    The matter proceeded to sentencing. Defense counsel argued that defendant had no history of prior delinquency and was a "good kid from a good home." Counsel specifically argued that the lack of criminal history was a factor in mitigation. Counsel stated:

> "We believe that his lack of criminal history, the fact that he was 18 years old at the time of the offense for which he was convicted, the fact that he did not have any criminal charges, parking tickets, speeding tickets, anything, the fact that he was a good student, that he got good grades and graduated from high school, graduated from junior college and graduated from college and that he mentored students and taught them shows that he deserves a lesser sentence ***."

In his statement of allocution, defendant maintained his innocence.

¶ 16    In rendering its sentence, the trial court noted that it reviewed the presentence investigation report. The court acknowledged that defendant had no juvenile record, no criminal record, and was a "very good" student. Defendant also had a strong employment history, and the court considered those factors in mitigation. The court also noted that it would not consider defendant's maintaining his innocence against him. Without mention of youth and its attendant circumstances, the trial court sentenced defendant to 50 years in prison. The mittimus reflected that defendant was convicted of three counts of first degree murder, and each sentence of 50 years would run concurrently with the others.

¶ 17    Following the imposition of the sentence, defense counsel clarified:

> "[DEFENSE COUNSEL]: Just one further matter of clarification as far as the sentence. My review of the sentencing order was that there was a 50-year sentence listed individually for Counts 1, 2 and 3. I just want to clarify that those merge for purposes of sentencing and that he serves one 50-year sentence.

6

THE COURT: That's correct. The law does not allow more than one 50-year sentence with one death, regardless of the three counts.

[DEFENSE COUNSEL]: Thank you, your Honor.

THE COURT: It's one 50-year sentence."

¶ 18    In an amended motion to reconsider sentence, relevant to this appeal, defendant argued that his sentence violated the Illinois proportionate penalties clause pursuant to *Miller*, 567 U.S. 460, where the court did not consider the factors of youth discussed in *Miller*, and requested an evidentiary hearing to develop the record as to why those factors should apply to him. Specifically, defendant contended that he was 18 years old at the time of the offense. He argued that the court failed to consider mitigating factors including his "young age at the time of the offense, the death of his mother 7 months prior to the offense, his lack of emotional and mental health support following the death of his mother, and his successful educational career following this incident." Counsel also argued that defendant's 50-year sentence violated the proportionate penalties clause where the court failed to take into account his "potential for rehabilitation and restoration as a citizen of the State of Illinois." In support thereof, defendant relied on *Miller* and its progeny.

¶ 19    Moreover, defendant pointed to *Harris*, 2018 IL 121932, which he argued allowed a method for young offenders to demonstrate, through development of an adequate factual record, that the protections of *Miller* apply to them. Defendant requested an "evidentiary hearing be held, in light of the harsh sentence, whereby he can further develop the record and introduce evidence as to why the *Miller* factors and *Buffer* requirements [(see *People v. Buffer*, 2019 IL 122327)] should apply to him."

¶ 20    The trial court held a hearing on the amended motion to reconsider sentence on June 16, 2023. Relevant to this appeal, defense counsel argued that "a 50-year sentence for a first offender,

7

such as [defendant], who was 18 years and 7 months of age" at the time of the offense violated the proportionate penalties clause where the court failed to

"take into account his particular mitigating factors, such as his young age, 18 years and 7 months, his—the death of his mother 7 months prior to this offense, the lack of his emotional and mental health support following the death of his mother, and his particular suitability for rehabilitation, such as his successful academic career that he was engaged in following the date of this incident."

Counsel argued that, had the mitigating factors been taken into consideration, defendant may have received a lesser sentence than 50 years.

¶ 21    Defense counsel acknowledged that defendant was not a juvenile. However, counsel explained that he was a "young adult" and that "some of the protections afforded to a juvenile offender should also be afforded to a young adult offender." For these reasons, defense counsel argued that the trial court should reconsider its imposition of a 50-year sentence. Additionally, counsel asked the court to grant defendant "leave to have an Evidentiary Hearing, to find out if his Mitigating Factors make him more akin to a—a youth offender than a young-adult offender and whether or not the *Miller* protection should apply to him."

¶ 22    In response, the State discussed *Harris*, noting that the record demonstrated:

"So what do we have in our record about the underdevelopment of the brain of a juvenile? So the defense making this argument wants to argue that Brodey Murbarger, at the time, was similarly situated to a juvenile. Okay? We know about Brodey Murbarger. He was an A.P. Honors high school student. He had graduated from high school prior to committing this offense. He had went on after that A.P. high school graduation to attend college, to publish articles, to be an instructor in some of his classes in college. So, in fact, the record

8

in our case would indicate exactly the opposite about the maturity and development of his brain."

¶ 23 The State argued that defendant's own character letters demonstrated that defendant excelled academically and professionally, which "contradicts any underdeveloped-brain theory." The State argued,:

"These are all in the record. They're all letters that you considered in mitigation. They're all let—information and facts that contradict that this defendant was like a juvenile or at the stage of a juvenile or similar—similarly situated somehow to a juvenile. Nothing in the record supports that, Your Honor."

¶ 24 Following arguments from counsel, the court denied the motion. The court noted that defendant was not a juvenile at the time of the offense. The court noted that it considered defense counsel's argument that defendant "had attributes of a juvenile"; however, the court noted that defendant was "more adult-like than juvenile-like." The court explained:

"[H]is actions were, in my opinion, more adult-like than juvenile-like. He—he was able to conceal this event for about six years. He was able to hold a job. That's a—an adult-like action. Actually, two jobs. And then—two part-time. And then, became a full-time job. That's an adult-type action. He was able to succeed in junior college and college. That's more like an adult. That's what a lot of parents would like their kids to—okay. Be an adult. Go to college. Go to class. Make your grades. Don't be a juvenile. So he—much of the material that's in the record skews Mr. Murbarger toward the adult side, rather than a juvenile side."

¶ 25 The court also explained that defendant's sentencing range was 20 to 60 years, and defendant was ultimately sentenced to 50 years. Thus, the court considered defendant's mitigating

9

factors in fashioning a sentence under the maximum. For these reasons, the court denied defendant's motion to reconsider. The court also denied defendant's request for an evidentiary hearing "to show that [defendant] had more attributes of a juvenile than an adult."

¶ 26    This timely appeal followed.

¶ 27                                    II. ANALYSIS

¶ 28    Defendant raises three arguments on appeal. First, defendant contends that the trial court's denial of a request for change of venue and request for appointment of an expert to conduct a phone survey deprived him of the right to a trial by an impartial jury. Next, defendant contends that he is entitled to a hearing pursuant to *Harris*, 2018 IL 121932, to determine whether the sentencing protections established in *Miller*, 567 U.S. 460, apply to him. Finally, defendant contends that two of his murder convictions must be vacated under the one-act, one-crime rule, because there was only one decedent. We address each argument in turn.

¶ 29                                  A. Change of Venue

¶ 30    Defendant first argues that the trial court's denial of his request for a change of venue and request for appointment of expert to conduct a phone survey deprived defendant of his right to a trial by an impartial jury. In support of his argument, defendant contends that "extensive media coverage and community gossip about the nature and details of the case demonstrated a reasonable apprehension that [defendant] could not receive a fair and impartial trial in rural Wayne County." The State responds, arguing that the court did not abuse its discretion by denying defendant's motions for change of venue and for appointment of an expert. We agree with the State.

¶ 31    First, we consider whether the trial court abused its discretion by denying defendant's motion for change of venue. The State argues that defendants "have the right to a jury that will

10

decide the case on the evidence before it, not to jurors ignorant of all facts and issues involved."

The State also contends that *voir dire* is the best means of ascertaining juror impartiality. We agree.

¶ 32    The denial of a change in venue will not be disturbed absent an abuse of discretion. *People v. Jones*, 83 Ill. App. 3d 168, 169 (1980). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20 (2000) (citing *People v. Illgen*, 145 Ill. 2d 353, 364 (1991)). According to section 114-6(a) of the Code of Criminal Procedure of 1963 (Code), "[a] defendant may move the court for a change of place of trial on the ground that there exists in the county in which the charge is pending such prejudice against him on the part of the inhabitants that he cannot receive a fair trial in such county." 725 ILCS 5/114-6(a) (West 2018). The defendant is entitled to a change of venue where there are reasonable grounds to believe that the prejudice alleged exists and there is a reasonable apprehension that the defendant cannot receive a fair and impartial trial. *People v. Gendron*, 41 Ill. 2d 351, 354 (1968).

¶ 33    Both the United States and the Illinois Constitutions protect a defendant's right to a trial before an impartial jury. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. For a jury's verdict to be impartial and fair, it must be solely based on the evidence heard during trial and not on information obtained elsewhere. *People v. Taylor*, 101 Ill. 2d 377, 386 (1984). If a defendant is denied his right to a fair trial because of the denial of a motion for change of venue or because of the denial of a challenge for cause to a juror, defendant must receive a new trial. *Id.* at 387. When determining whether a defendant received a fair trial from an impartial jury, "there is no simple test which we can apply to every case." *Id.* at 391. Rather, the decision must be based on the totality of the circumstances. *Id.*

11

¶ 34    The right to an impartial jury does not require that jurors be completely ignorant of the case before trial. *People v. Coleman*, 168 Ill. 2d 509, 547 (1995). Heinous crimes are reported extensively in the media, and it would be unreasonable to expect jurors not to have at least heard of those cases prior to trial. *Taylor*, 101 Ill. 2d at 386. An impartial jury can be secured under such circumstances if the jurors are willing and able to put aside their preconceptions and decide the case based upon the evidence presented at trial. *Coleman*, 168 Ill. 2d at 547. Ordinarily, the best way to determine whether a juror can be impartial is to ask. *Taylor*, 101 Ill. 2d at 398. *Voir dire* is a significant tool in determining whether a juror can lay aside any biases and make a determination solely on the basis of evidence presented in court. *Id.*

¶ 35    In support of his position, defendant relies upon *Taylor*. In *Taylor*, the 13-year-old defendant was charged with murder in a highly publicized case. *Id.* at 381-83. The "unprecedented" media coverage reported that defendant's suspected codefendant had been released after passing a polygraph test, while the results of defendant's polygraph test were "inconclusive." *Id.* at 383. The *voir dire* questioning revealed that six of the jurors who ultimately found defendant guilty were aware that the codefendant had been released, and three connected his release to his performance on the polygraph test. *Id.* at 388. Our supreme court found that defendant was denied a fair trial because of the prejudicial effect of the knowledge of the lie detector test. *Id.* at 395-96. Based on the unprecedented volume of publicity combined with the highly prejudicial nature of the polygraph results, the supreme court held that the jurors' claims to impartiality could not be accepted, and any jurors with knowledge of the polygraph results should have been excused. *Id.* "If the biasing effect of the information is so powerful that it cannot be considered, even under the controlled conditions of the courtroom, then certainly access to the

12

same biasing information, under the uncontrolled influence of the news media, cannot be allowed to affect the outcome of a trial." *Id.* at 392.

¶ 36   This case is distinguishable from *Taylor*, where the media coverage in this matter, specifically social media posts highlighted by defense counsel, was not as highly prejudicial as the polygraph evidence at issue in *Taylor*. This is particularly true where the parties empaneled 12 jurors who indicated that they could be fair and impartial, had limited, if any, knowledge of the case from the media, and did not have preconceived opinions about the case. In denying defendant's motion, the trial court acknowledged that there was publicity about the case; however, the court determined that any bias or prejudice would be discovered during *voir dire*. The court also kept the door open for counsel to renew his motion for a change of venue during jury selection, should the parties struggle to empanel a jury. We finally note that Nichols went missing in July 2014, her remains were discovered in December 2017, and defendant was ultimately arrested in October 2020. Defendant's trial commenced in October 2022. A lapse of time between the publicity and actual trial may be sufficient to dissipate any feeling of prejudice resulting from the pretrial publicity. *People v. Black*, 52 Ill. 2d 544, 558 (1972).

¶ 37   The record before us demonstrates that the trial court carefully considered the arguments of the parties, took the matter under advisement, and continued to research the impact of social media on its decision. We cannot say that the trial court's thoughtful and well-reasoned approach to this issue constituted an abuse of discretion, which, as explained above, occurs "only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Hall*, 195 Ill. 2d at 20 (citing *Illgen*, 145 Ill. 2d at 364). For these reasons, the trial court did not abuse its discretion by denying defendant's motion for change of venue.

¶ 38　　Next, we consider whether the trial court abused its discretion by denying the motion for appointment of an expert to conduct a phone survey. We review a trial court's denial of a motion for an expert witness for an abuse of discretion. *In re Commitment of Lingle*, 2018 IL App (4th) 170404, ¶ 39. We reiterate that "[a]n abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Hall*, 195 Ill. 2d at 20 (citing *Illgen*, 145 Ill. 2d at 364).

¶ 39　　A trial court has the authority to appoint an expert witness at no cost to an indigent defendant pursuant to the Code in a capital case and may order the county pay for necessary expert witnesses "reasonable compensation *** not to exceed $250." 725 ILCS 5/113-3(d) (West 2018)). This section was expanded by the supreme court to include noncapital felonies. *People v. Watson*, 36 Ill. 2d 228, 234 (1966). The supreme court also ruled that courts could exceed the $250 limit prescribed in the Code. *People v. Kinion*, 97 Ill. 2d 322, 336 (1983). However, there must first be a showing that the expert's services are necessary to prove a crucial issue in the case and also that the lack of funds would prejudice the defendant. *People v. Glover*, 49 Ill. 2d 78, 82-83 (1971), *overruled on other grounds by People v. Lopez*, 207 Ill. 2d 449 (2003).

¶ 40　　In the case before us, defendant failed to establish a critical need for an expert witness to conduct a phone survey in support of his motion for change of venue. The trial court determined that *voir dire* would obtain a fair jury in defendant's case. Specifically, the court noted, "I believe, based on the case law that I reviewed, the fact of the case, and the fact that I believe and the case law supports *voir dire* is the best method to pick a jury." The court noted that if they were unable to pick a "fair and unbiased jury out of Wayne County," then "we're not going to have" a trial. We cannot say that the trial court's ruling denying funding for an expert witness amounted to an abuse of discretion because we do not conclude that ruling was "arbitrary, fanciful, [or] unreasonable,"

14

and we do not believe that "no reasonable person would take the view adopted by the trial court." *Hall*, 195 Ill. 2d at 20 (citing *Illgen*, 145 Ill. 2d at 364). For these reasons, the trial court did not abuse its discretion by declining to appoint an expert to conduct a phone survey of potential jurors.

¶ 41                                    B. Sentencing

¶ 42    Next, we consider whether defendant's 50-year prison sentence violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) due to defendant's youth and attendant circumstances. Defendant argues that this court should remand this cause for a hearing pursuant to *Harris*, 2018 IL 121932, to determine whether the sentencing protections established in *Miller*, 567 U.S. 460, apply to 18-year-old defendant. The State responds, arguing that defendant's proportionate penalties clause claim is meritless.

¶ 43    Here, defendant was undoubtedly not a juvenile when the murder in this case occurred. At the time of the offense, defendant was 18 years old. Accordingly, *Miller* and its progeny is inapplicable to this case. See *id.* at 489. Succinctly stated, this case does not involve a juvenile offender.

¶ 44    Nonetheless, defendant contends that this court should remand for a hearing pursuant to *Harris*, 2018 IL 121932, ¶¶ 54-61. Specifically, defendant alleges that he is entitled to an evidentiary hearing under *Harris* for the trial court to determine whether the imposition of a *de facto* life sentence is unconstitutional as applied to him. Defendant claims that such a hearing is necessary where the trial court failed to utilize the prescribed procedure for addressing an as-applied constitutional challenge. An as-applied constitutional challenge is a legal question that we review *de novo*. *People v. House*, 2021 IL 125124, ¶ 18; *People v. Coty*, 2020 IL 123972, ¶ 22.

¶ 45    Following briefing and oral argument in this matter, in *People v. Spencer*, 2025 IL 130015, the Illinois Supreme Court considered whether a 20-year-old offender's 100-year sentence violated

15

the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because it was a *de facto* life sentence. In *Spencer*, a unified court reiterated that *Miller* only applies to juveniles and not to emerging adults. *Spencer*, 2025 IL 130015, ¶ 48. However, the *Spencer* court determined that the 20-year-old offender's 100-year sentence was not a *de facto* life sentence, where he had a meaningful opportunity for parole after 20 years. *Id.* Nonetheless, the supreme court determined that the defendant was "not foreclosed from bringing his proportionate penalties claim in a postconviction petition." *Id.* For the reasons that follow, we find *Spencer* instructive.

¶ 46    In *Spencer*, the State charged the defendant with first degree murder, attempted murder, and home invasion, for offenses that occurred when the defendant was 20 years old. *Id.* ¶ 1. A jury ultimately convicted the defendant of all three charges. *Id.* The trial court sentenced the defendant to an aggregate 100 years in prison. *Id.*

¶ 47    The defendant appealed, arguing that as applied to him, his sentence violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because it was a *de facto* life sentence. *Spencer*, 2025 IL 130015, ¶ 1. The First District disagreed, finding that the defendant's eligibility for parole pursuant to section 5-4.5-115(b) of the Unified Code of Corrections (Code of Corrections) (730 ILCS 5/5-4.5-115(b) (West 2020)) precluded his 100-year aggregate sentence from being a *de facto* life sentence. *People v. Spencer*, 2023 IL App (1st) 200646-U, ¶ 143.

¶ 48    The Illinois Supreme Court accepted the defendant's petition for leave to appeal. Before the supreme court, the defendant argued that as applied to him, his *de facto* life sentence violated the Illinois proportionate penalties clause and that Illinois's youth parole statute (730 ILCS 5/5-4.5-115(b) (West 2020)) did not cure the imposition of an otherwise unconstitutional sentence. *Spencer*, 2025 IL 130015, ¶ 23. Specifically, he argued that the imposition of a 100-year sentence

16

without consideration of *Miller*-based, youth-related factors in mitigation violated the proportionate penalties clause. *Id.*

¶ 49    First, the Illinois Supreme Court reiterated its position that *Miller* did not apply to emerging adults. *Id.* ¶¶ 27-32. The court noted that it "continue[d] to hold that *Miller* only applies to juveniles and does not apply to emerging adults." *Id.* ¶ 32.

¶ 50    However, the court went on to explain that the parole review statutes precluded the defendant's sentence from being a *de facto* life sentence. *Id.* ¶¶ 33-40. The *Spencer* court acknowledged that "the science that helped form the basis for the *Miller* decision may assist emerging adult defendants in supporting an as-applied, proportionate penalties clause challenge" relying on *Harris*. *Id.* ¶ 34 (citing *Harris*, 2018 IL 121932, ¶ 46). Because the defendant in *Spencer* was under the age of 21 at the time of his offenses, he was eligible for parole review by the Prisoner Review Board after serving 20 years or more of his sentences (730 ILCS 5/5-4.5-115(b) (West 2020)). *Spencer*, 2025 IL 130015, ¶ 35. Thus, the defendant was sentenced under a statutory scheme that made him eligible for parole before he spent more than 40 years in prison. *Id.* The supreme court previously established in *People v. Dorsey*, 2021 IL 123010, ¶¶ 39, 50, and *People v. Buffer*, 2019 IL 122327, ¶ 40, that a prison sentence of 40 years or more constituted a *de facto* life sentence.

¶ 51    The supreme court determined that based on the statutory provision invoked to review parole petitions for emerging adults convicted of first degree murder provides that the opportunity for release requires consideration of "the diminished culpability of youthful offenders, the hallmark features of youth, and any subsequent growth and maturity of the youthful offender during incarceration" (730 ILCS 5/5-4.5-115(j) (West 2020)). *Spencer*, 2025 IL 130015, ¶ 40. In *Spencer*, specifically because the defendant was under 21 at the time of the offense, he would be

17

eligible for parole review after serving 20 years of his sentence. *Id.* Therefore, he was allowed "a meaningful opportunity to obtain release before he spends 40 years in prison." *Id.* Because of this, the supreme court determined that he was not sentenced to a *de facto* life sentence. *Id.*

¶ 52    Similarly, here, defendant's crime subjected him to a prison term of 20 to 60 years for first degree murder (see 720 ILCS 5/9-1 (West 2020)). Because the defendant was 18 years old at the time of the offense, he is eligible for parole under section 5-4.5-115 of the Code of Corrections. See 730 ILCS 5/5-4.5-115(b) (West 2020). In other words, defendant was, therefore, sentenced under a statutory scheme that makes him eligible for parole before he serves more than 40 years in prison. As such, similar to *Spencer*, defendant did not receive a *de facto* life sentence.

¶ 53    However, the supreme court did not end its analysis there. Rather, the court went on to determine that the *Spencer* defendant was not foreclosed from bringing his as-applied challenge to his sentence pursuant to the Illinois proportionate penalties clause. *Spencer*, 2025 IL 130015, ¶¶ 41-46. The court noted that a "defendant may challenge a sentence of any length." *Id.* ¶ 43. Relying on *People v. Hilliard*, 2023 IL 128186, ¶ 29, the *Spencer* court stated, "the Illinois Constitution does not limit a proportionate penalties challenge to just juveniles or individuals with life sentences." *Spencer*, 2025 IL 130015, ¶ 43. The court also reiterated that "this court has not barred young adult defendants from raising as-applied proportionate penalties clause challenges to life sentences based on the evolving science regarding juvenile maturity and brain development." *Id.*

¶ 54    In order to raise the as-applied challenge, the supreme court noted that "it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." (Internal quotation marks omitted.) *Id.* ¶ 44. The court pointed to *Harris*, 2018 IL 121932, ¶¶ 1, 41, wherein an 18-year-old defendant was sentenced to a mandatory minimum

18

aggregate term of 76 years' imprisonment and the supreme court stated that the record needed to be sufficiently developed in the circuit court through an evidentiary hearing and findings of fact to review the defendant's constitutional claim. Additionally, in *House*, 2021 IL 125124, ¶¶ 5, 31, a 19-year-old defendant was sentenced to a mandatory natural life term for murder, and the supreme court determined that the appellate court erred in holding that his natural life sentence violated the proportionate penalties clause as applied to him without a developed evidentiary record or factual findings on the issue.

¶ 55    Thus, the *Spencer* court ultimately determined that "as-applied constitutional claims cannot ultimately succeed absent a sufficiently developed evidentiary record" and that the defendant's as-applied challenge was better raised in a postconviction petition. *Spencer*, 2025 IL 130015, ¶ 45. In support thereof, the court looked to *Harris*, 2018 IL 121932, ¶ 48, which concluded that an 18-year-old defendant's as-applied proportionate penalties challenge was "more appropriately raised" in a postconviction proceeding rather than on direct appeal. The court also looked to *People v. Thompson*, 2015 IL 118151, ¶ 44, where the court found that a 19-year-old defendant was not necessarily foreclosed from raising an as-applied challenge in the trial court and observed that defendant's constitutional claims could be resolved in a postconviction petition. Therefore, the supreme court ultimately concluded that the defendant in *Spencer* was "not foreclosed from bringing his as-applied challenge to his 100-year sentence under the proportionate penalties clause through a postconviction proceeding." *Spencer*, 2025 IL 130015, ¶ 46.

¶ 56    Similar to *Spencer*, here, the record is insufficient for this court to consider defendant's as-applied constitutional claims. Although counsel raised an as-applied challenge in his motion to reconsider sentence, and the trial court ultimately held a hearing on the motion, we cannot say that the hearing rose to the level of an evidentiary hearing necessary to fully consider defendant's

19

claims on direct appeal. Similar to *Harris*, 2018 IL 121932, ¶ 41, and *House*, 2021 IL 125124, ¶ 31, the record must be sufficiently developed in the circuit court through an evidentiary hearing and findings of fact to review the defendant's constitutional claim. We therefore conclude that defendant's proportionate penalties claim is better raised in a postconviction petition.

¶ 57 Defendant also argues that his counsel was ineffective for failing to introduce evidence or testimony from an expert that demonstrated defendant's hallmarks of youth during the motion to reconsider sentence hearing. The State responds, arguing that the record is insufficiently developed to determine whether counsel was ineffective. Because we conclude that defendant's proportionate penalties claim as a whole is better raised in a postconviction proceeding, we need not consider the merits of whether defense counsel was ineffective.

¶ 58                                    C. One-Act, One-Crime

¶ 59 Defendant contends that two of his murder convictions must be vacated under the one-act, one-crime rule because there was only one decedent. He contends that the mittimus reflects convictions and sentences on all three counts. The State agrees and notes that this court should order entry of an amended sentencing order. The record shows that the written sentencing order reflects three concurrent 50-year sentences.

¶ 60 The one-act, one-crime rule prohibits convictions for multiple offenses based on the same single physical act. *People v. Miller*, 238 Ill. 2d 161, 165 (2010); *People v. King*, 66 Ill. 2d 551, 566 (1977). Pursuant to the one-act, one-crime rule, a trial court should impose a sentence on the more serious offense and vacate the less serious offense. *People v. Smith*, 233 Ill. 2d 1, 20 (2009); *People v. Artis*, 232 Ill. 2d 156, 170 (2009). Whether a conviction violates the one-act, one-crime rule is a question of law that we review *de novo*. *People v. Robinson*, 232 Ill. 2d 98, 105 (2008); *People v. Daniels*, 187 Ill. 2d 301, 307 (1999). We agree that defendant's three first degree murder

20

convictions all arise from the same single act with one decedent. We therefore vacate defendant's convictions and sentences on counts I and II order the mittimus corrected accordingly.

¶ 61                                    III. CONCLUSION

¶ 62     We vacate defendant's convictions and sentences on counts I and II, and we order the mittimus corrected accordingly. The judgment of the trial court of Wayne County is otherwise affirmed.

¶ 63     Affirmed in part and vacated in part; mittimus corrected.

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Wayne County, No. 20-CF-162; the Hon. Michael J. Molt, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Arianne Stein, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Katherine M. Doersch and Eldad Z. Malamuth, Assistant Attorneys General, of counsel), for the People. |